## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## SOUTHERN DIVISION at LONDON

| | |
|---|---|
| **MARLIN RICE,** | |
| *Plaintiff,* | **Civil Action** No. 6:21-cv-00173-REW-HAI |
| **v.** | |
| **BITUMINOUS CASUALTY CORP.** | |
| *Defendant.* | |

## DEFENDANT'S COMBINED RESPONSE TO PLAINTIFF'S MOTION
## FOR SUMMARY JUDGMENT
## AND BRIEF IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT

/s/ Matthew J. Zanetti
Matthew J. Zanetti
Ferreri Partners, PLLC
2410 Frankfort Avenue
Louisville, KY 40206
(502) 459-2685
mzanetti@ferrerilaw.com

Mark E. Solomons (pro hac vice)
Greenberg Traurig, LLP
2101 L Street, N.W., Suite 1000
Washington, D.C. 20037
(202) 533-2362
solomonsm@gtlaw.com

*Attorneys for Defendant*

Defendant Bituminous Casualty Corp., by and through undersigned counsel and pursuant to Fed. R. Civ. P. 56, responds to Plaintiff's Motion for Summary Judgment and cross-moves for Summary judgment on Plaintiff's claims seeking penalties where none are owed.  In support of the relief requested, Bituminous Casualty Corp. states as follows:

## INTRODUCTION

Boiled to its essence, this case centers on a perceived loophole exploited to confuse concepts from the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901-950, on the one hand, and the Black Lung Benefits Act, 30 U.S.C. §§ 901-45, on the other.

While the latter act borrows from the former, the two are very different. The Longshore Act, alone, encourages prompt resolution, without litigation or agency involvement and on mutually agreed-to terms. It does so through 33 U.S.C. § 914(f), the provision at play in this case.

Against this backdrop, Plaintiff's claim fails because it reads the BLBA without regard to practical and legislative considerations distinguishing the two Acts.  It fails separately because it demands an impractical process where employers must divine what they owe long before such calculations are made.  This case, where the agency has *still* failed to substantiate the amounts owed and the parties remain uncertain, crystalizes that problem. Plaintiff's approach encounters another practical problem:  if accepted, it could force parties into parallel proceedings to enforce penalties while an employer's appeal on the merits remains pending.  Finally, Plaintiff's requested windfall requires this Court to mix-and-match regulations and statutes to enforce a penalty unsupported by the BLBA's plain text. Especially because it is now three years too late to enforce the stale pay order he cites, the Court should deny Plaintiff's Motion for Summary Judgment and grant this, Defendant's Cross-Motion.

1

### BACKGROUND AND STATEMENT OF UNDISPUTED MATERIAL FACTS[1]

**This Suit's Related Administrative and Appellate Proceedings**

This case has a long and tortured history, common for black claims. Marlin Rice first applied for benefits in 1983, shortly after he retired from mining. *Karst Robbins Coal Co. v. Dir., OWCP [Rice]*, 969 F.3d 316, 320 (6th Cir. 2020). DOL denied the claim because the proof failed to establish that Rice had pneumoconiosis or was totally disabled, let alone disabled due to pneumoconiosis. For the next thirty-five years, the parties and courts disputed (1) whether Rice could prove he had totally disabling pneumoconiosis and (2) in the event Rice could prove his case, who should pay any benefits owed. A fraudulent practice called employee leasing factored in, complicating matters further.

As it happens, Rice's employer KRCC and the Karst Robbins Machine Shop, a related entity, engaged in an employee leasing scheme. In short, these unscrupulous employers and others like them would create "dummy" companies, transfer their employees to the "dummy" companies, and then "lease back" their own employees without having to pay insurance premiums reflecting the actual number of workers covered or to capture a premium multiplier applied to companies like KRCC to reflect excessive losses. The new entity, KRMS here, would not have a similarly adverse loss experience being a new entity and thus could avoid paying the multiplier at least until it got caught. This deprived commercial insurers, like Bituminous, of the legally approved and correct premiums for coverage. As the Sixth Circuit explained:

> Karst Robbins Coal Co., ("KRCC") operated a coal mine where Rice worked from at least June 7, 1982 to August 9, 1983. But on paper, Rice never worked for KRCC. Instead, he was employed by a separate corporate entity, Karst Robbins Machine Shop, Inc…According to evidence submitted by Bituminous, KRCC only listed ten employees on its books…Bituminous describes this as a scam designed to dodge the otherwise higher premiums KRCC would have paid for BLBA and workers' compensation coverage.

*Rice*, 969 F.3d at 320.

---

1 Defendant adopts Plaintiff's stated undisputed material facts as its own.

Rice's various claims for black lung benefits were denied multiple times over the years. Each time, he persisted.[2]  During proceedings on Rice's 2002 claim, Bituminous denied coverage based on KRCC and KRMS's fraudulent arrangements, which it only discovered years after the scheme concluded. After that claim was denied on the medical merits, Rice filed again, in 2006. This time Bituminous moved to rescind its insurance policy with KRCC.  The ALJ rejected the effort, but denied Rice's claim just the same.  Rice appealed and the Board remanded.

"Following this remand, during a years-longer procedural morass, another ALJ revealed that Rice's attorney" had *ex parte* phone calls with a DOL claims examiner.  *See Rice*, 969 F.3d at 322. Bituminous learned that during these discussions, Rice's prior counsel attempted to convince the District Director to treat Rice's claim as one seeking modification rather than as a subsequent claim—a posture featuring comparatively lenient burdens of proof more favorable to Rice.  The District Director obliged, setting off a years'-long dispute about the conduct and its prejudice.

Years later, in 2013, an ALJ again denied benefits.  Rice filed for modification and "for the first time during the three decades of Rice's BLBA proceedings" in September 2017 ALJ Solomon found Rice eligible for benefits. *Id*. at 322.  Once this happened, the agency began paying interim benefits from the Black Lung Disability Trust Fund pursuant to 26 U.S.C. § 9501 (d) (ii).

The ALJ did not issue a calculation of what was owed; that came a month later from the District Director, after Bituminous had already appealed the award to the Board.  Immediately, the pay order became stale—both because litigation was ongoing and because additional interest (charged at a rate that changes quarterly, by regulation) and medical expenses were being incurred.

The Board affirmed the award and Bituminous appealed to the Sixth Circuit.  Besides challenging the ALJ's medical merits determination, Bituminous argued that (1) collateral estoppel precluded the designation of KRCC as the responsible operator; (2) Bituminous was entitled to rescind its insurance agreement with KRCC based on its allegations of fraud; and (3) the late

---

[2] Reflecting on these events, the Sixth Circuit noted "the procedural history of Rice's BLBA claims falls somewhere between Kafka and Joyce." *See Rice*, 969 F.3d at 321 n.1.

disclosure of the claims examiner's *ex parte* communication with Rice's prior counsel violated Bituminous' right to due process and was illegal under 5 U.S.C. § 557 (d). The Board and Court of Appeals affirmed.  All the while, Rice continued to receive monthly benefits from the Fund.

The Fund recovers payments it makes on behalf of an operator or carrier with interest if an award of benefits becomes final. 30 U.S.C. §934(b). On February 4, 2021, after receiving a pay order, Bituminous paid Rice's retroactive benefits. It also provided Rice with his first forward-looking monthly payment of $1,040.40.  It has continued to pay Rice monthly benefits ever since.

Interest owed presented another complication.  On July 27, 2021, the agency demanded $65,443.78 in interest.  Despite considerable efforts, counsel could not understand the agency's method of calculation or how the agency arrived at the amounts supposedly due, which were substantially higher than counsel's independent calculations. Dec of Knechtel at ¶ 22. Beginning in July 2021, counsel for Bituminous made multiple telephone calls to the agency to understand its calculation.  To date, the agency has not explained the amounts it believes are due and owed, and has not explained or shared its method of calculation.  For instance, on August 13, 2021, the agency stated, in conclusory fashion, that "the interest calculation dated July 27, 2021 was properly calculated and no further breakdown is appropriate." *Id*. at ¶ 24. It has still provided no formula.

Citing section 914(f) of the Longshore Act, Rice seeks a 20% penalty from Bituminous, citing the District Director's September 2017 pay order, as well as interest.

**The Longshore Act and Black Lung Benefits Act**

Rice's suit requires this Court to interpret the federal Black Lung Benefits Act, which borrows portions from the Longshore Act and has been described, variously, as a "legislative morass," "statutory muddle," and a "convoluted process" reflecting "abysmally inept drafting." *See Dir., OWCP v. Bivens*, 757 F.2d 781, 785 (6th Cir. 1985) (internal quotations and citations omitted). Especially against this backdrop, the Court "must be careful not to apply rules applicable under one statute to a different statute without careful and critical examination."  *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 174 (2009).  Rather, "the Sixth Circuit's interpretation of statutory

language is informed by practical considerations," endeavoring to find a "rational and sensible construction of the language in question." *United States v. Copple*, 24 F.3d 535, 543 (3d Cir 1994).

Recognizing that most Longshore claims are filed at the time of injury, "[t]he fundamental purpose of the Act is to compensate employees (or their beneficiaries) for wage-earning capacity lost because of injury." *Metropolitan Stevedore Co. v. Rambo*, 515 U.S. 291, 298 (1995) ("*Rambo I*"); *Metropolitan Stevedore Co. v. Rambo*, 521 U.S. 121, 126 (1997) ("*Rambo II*") ("The LHWCA authorizes compensation not for physical injury as such, but for economic harm to the injured worker from decreased ability to earn wages."). The Act is "designed to encourage payment of compensation by employers voluntarily and without resorting to formal adversary proceedings." *Universal Terminal Stevedoring v. Parker*, 587 F.2d 608, 611 (3d Cir. 1978) (citing *Strachan Shipping Co. v. Hollis*, 460 F.2d 1108 (5th Cir.), *cert denied*, 408 US 887 (1972)).[3] In fact, the Department does not receive notice of claims unless the noticed employers who are served with them "bring the administrative process into play" and "set into motion" the agency's "formal claim resolution procedures." *Id*. Employers are encouraged to "minimize[] administrative activity" by settling claims promptly and voluntarily. *Id.*; *see also id.* ("if the parties do not reach an agreement ["to resolve the matter to their mutual satisfaction"], any award by the Board will be automatically increased"). Because "the LHWCA does not contain a fund to provide injured employees payments when an employer refuses to pay,"[4] endeavors to afford "speedy" redress to employees

---

[3] In *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93 (2012), the Supreme Court recognized that for claims brought under the Longshore Act, a central piece of the program, set forth in section 14(a), requires employers to pay benefits voluntarily, *i.e.*, without formal administrative proceedings, when it receives notice of a disabling injury. In most of these Longshore Act-related cases, employers almost always pay benefits without contesting liability and thus, no compensation order issues and there is no litigated dispute. *Id.*, 566 U.S. at 98; 33 U.S.C. § 908(i). The majority of Longshore cases (perhaps 90%) are settled this way. LHWCA Bulletin No. 14-05 (Sept. 17, 2014) (available at www.dol.gov/owcp/dlhwc/lsindustrybulletins/LSBulletin14-05.htm.) (last accessed June 20, 2022).

[4] 301 F. Supp. 3d 785, 800 (E.D. Tenn. 2017).

who only receive benefits at their cases' conclusions and who might "go into debt while waiting for an award."[5]

The penalty provision Rice cites from section 914(f) fits well within this scheme. It "provides a quick and inexpensive mechanism for the prompt enforcement" of settlement and prompt payment of compensation in lieu of salary while the employee is unable to work because of a job-related injury. Toward these ends, the LHWCA compensation system allows an employer "the opportunity to escape assessment of claimant's counsel fee by agreeing in advance to accept the findings of an impartial medical examiner." *Parker*, 587 F.2d at 611. And it ensures that deserving claimants are compensated quickly and while they are disabled for work. These features carry out policy considerations underpinning the provision's legislative history and its purpose of capturing the salutary approaches of state workers compensation systems for employees subject to admiralty jurisdiction outside the scope of State authority. *See Crowell v. Benson*, 285 U.S. 22, 38-43 (1932).

In at least six material ways, Black Lung litigation is different. First, the case at bar crystalizes what black lung practitioners well-know: there is no hope for "quick, inexpensive" claims resolution in black lung litigation, which are often protracted and allow claimants endless bites of the proverbial apple. *See, e.g.*, 20 C.F.R. §§ 725.309, 310 (allowing for a potentially endless number of modification requests, so long as they are timely filed).

Second, in contrast with the encouraged outcome in Longshore matters, "the Black Lung Benefits Act, in plain and unmistakable terms, forbids the settlement of claims for black lung

---

5 *See Arrow Stevedore Co. v. Pillsbury*, 88 F.2d 446 (9th Cir. 1937); Statement of Samuel J. Smith, Chief, Administrative Appeals Judge, Benefits Review Board, US Department of Labor Before the Subcommittee on Labor of the Senate Committee on Labor and Human Resources re S. 1182, Proposed Amendments to The Longshoremen's and Harbor Workers' Compensation Act at P.35-36 (1981) ("1981 Leg. Hist.").

benefits." *Ramey v. Dir., OWCP*, 326 F.3d 474 (4th Cir. 2003). Third, there is no hope to avoid claimant's counsel fees, which are mandatory. 20 C.F.R. § 725.366.

Fourth, there is no way to avoid a formal administrative process in black lung litigation. The agency, not an employer, is served with claim notices and a formal claim resolution procedure begins immediately upon a claim's filing. 20 C.F.R. § 725.303(a)(1). The "Office of Workers' Compensation Programs…must develop the medical evidence necessary to determine each claimant's entitlement to benefits." 20 C.F.R. § 718.101(a). The agency also bears responsibility for investigating, notifying, and serving potentially responsible parties. *See* 20 C.F.R. 725.407(a) ("Upon receipt of the miner's employment history, the district director shall investigate whether any operator may be held labile for the payment of benefits as a responsible operator").

Fifth, claims under the BLBA, like Mr. Rice's, are usually filed long after the claimant has left coal mine employment, and thus do not compensate them for lost earnings resulting from time off the job. Black lung benefits are calculated according to an artificial formula having nothing to do with wage replacement. 30 U.S.C. § 922(a). Although the Longshore Act also provides compensation for potentially latent diseases, unlike the BLBA, it has not been interpreted to permit successive claims, like the ones Rice filed between 1983 and 2006. Rather, once a Longshore claim has been adjudicated, if no petition for modification is filed within one year of the last payment of benefits or the last denial of a claim, the litigation of that claim is over. *See Rambo II*, 521 U.S. at 129 (recognizing that 33 U.S.C. § 913(a) "bars an injured worker from waiting for adverse economic effects to occur in the future before bringing his disability claim, which generally must be filed within a year of injury" and under 33 U.S.C. § 922, "a losing claimant loses for all time after one year from the denial of termination of benefits …."); *see also Rambo*, 515 U.S. at 298 ("where that wage-earning capacity has been reduced, restored, or improved, the basis for compensation changes and the statutory scheme allows for modification.").

In contrast, black lung adjudications presuppose a disease process that may take decades to develop and most of the time claims are filed decades after the miner retired due to old age or

7

other disabilities outside the Act's compensation scheme. *See* 20 C.F.R. § 718.201(c); *see also Peabody Coal Co v. Blankenship*, 773 F.2d 173, 177 n.7 (7th Cir. 1985) ("there is a fundamental different between the injury compensable under the [Longshore Act] and those compensable under the Black Lung Benefits Act"). Overly complicated DOL regulations that are inconsistently applied promote excessive litigation that often drags on for years or decades. The onerous process and extraordinary complexity of federal black lung adjudication has been noted critically by the Sixth Circuit and others. *See Bivens*, 757 F.2d at 785.

Finally, the Black Lung Disability Trust Fund "steps in and pays" interim benefits (including medical costs) to any miner for whom DOL proposes an appealable award of benefits, long before an ALJ ultimately rules on that proposed award and even before a potentially responsible private employer has a real opportunity to develop evidence in opposition. *See* 26 U.S.C. § 9501(d)(1)(A). By law, the Fund, not Bituminous, was required to do so at that point. *See* 20 C.F.R. § 725.522; 30 U.S.C. § 934(b). This last feature is especially fundamental, providing the "quick redress" to employees absent from Longshore litigations (*i.e.* where a claimant might have to "go into debt while waiting for an award,")[6] and encouraged by section 914(f). This means that once the agency makes an initial determination, the claimant begins receiving benefits; nothing "is not paid" in black lung adjudications the way it is in Longshore adjudications. In black lung proceedings, interim benefits continue throughout the duration of litigation, through ALJ proceedings and subsequent appeals.

In sum, at least six "practical considerations" inform section 914(f) of the Longshore Act. None of those apply in black lung. Hybridizing the two schemes, as Rice does, is neither rational nor sensible. *Cf. Copple*, 24 F.3d at 543. This is why the Black Lung Benefit's Act's payment provision was made distinct from Section 914(f) of the Longshore Act.

Section 914(f) of the Longshore Act provides in relevant part:

---

6 1981 Leg. Hist. at 35-36.

> If any compensation payable under the terms of an award is not paid within ten days after it becomes due there shall be added to such unpaid compensation an amount equal to 20% thereof which shall be paid at the same time as but in addition to such compensation. . . .

The BLBA expressly provides that Longshore procedures, to the extent applicable in black lung claims, may be changed, amended, or even abandoned by DOL in the black lung program. Section 422(a), 30 U.S.C. § 932(a), states that the provisions of the Longshore Act, not expressly excluded by statute, may apply in black lung claims

> except as otherwise provided in this subsection or by regulations of the Secretary .... In administering this part, the Secretary is authorized to prescribe in the Federal Register such additional provisions, not inconsistent with those specifically excluded by this subsection, as he deems necessary to provide for the payment of benefits by such operator to persons entitled thereto as provided in this part and thereafter those provisions shall be applicable to such operator.

The Sixth Circuit and the Supreme Court have both recognized and reaffirmed this authority. *Bivens*, 757 F.2d at 785-88 (6th Cir. 1985) (cautioning that "a completely literal reading of the procrustean incorporation accomplished by 30 U.S.C. § 932(a) would lead to some absurd results"); *Dir. OWCP v. Greenwich Collieries*, 512 U.S. 267, 271 (1994).

Perhaps anticipating suits like the one at bar, and mindful of the differences between the two programs, the Secretary of Labor, by regulation, altered the approach to be applied to black lung claims. Departing from the Longshore Act, where congress considered, but explicitly refused to elaborate on the matter, black lung rules include a regulation that defines when a benefit payment following an adjudicated award becomes "due" and payable. DOL's regulation at 20 C.F.R. § 725.502(b) states:

> "(b)(1) While an effective order requiring the payment of benefits remains in effect, such benefits, at the rates set forth in § 725.520, shall be due on the fifteenth day of the month following the month in which the benefits are payable. For example, benefits payable for the month of January shall be due on the fifteenth day of February.
>
> (2) Within 30 days after the issuance of an effective order requiring the payment of benefits, the district director shall compute the amount of

benefits payable for the periods prior to the effective date of the order, in addition to any interest payable for such period (*see* § 725.608), and shall so notify the parties.  Any compensation made by the district director under this paragraph shall strictly observe the terms of the order.  Benefits and interest payable for such <u>periods shall be due on the thirtieth day following issuance of the district director's computation.</u> . . ."

(emphasis added).  As discussed below, the only "rational and sensible construction of the language in question" is to find the computation in question to be the one issued at the end of appellate proceedings in 2021, not the stale one issued years earlier.  *Copple*, 24 F.3d at 543.

## ARGUMENT

A Court must grant summary judgment where, as here, "the record, viewed in the light most favorable to the nonmoving party, reveals that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing Fed. R. Civ. P. 56(c)); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Given the undisputed facts underlying his claim, for Plaintiff to prevail and have this case proceed, the Court must accept as true a foundational assumption.  Specifically, the Court must hold that, contrary to the plain language of the BLBA and practical considerations, payments are due before the decision becomes final and before the agency announces and explains the amounts owed.  Such a finding would deviate from the precedent of at least three circuit courts of appeal, including the Sixth Circuit.  It would also invite an unworkable, impractical administrative scheme, burdening all parties—the Department of Labor, claims defendants and claimants seeking recovery under the BLBA.  Finally, it would contravene Plaintiff's own jurisdictional statement, which asks this court to enforce a "final" compensation order.  Because controlling case law from both this Circuit and the Supreme Court prevent such a result, and because there are no material facts in dispute concerning the timing of Defendants' payment to the Plaintiff, Bituminous is entitled to summary judgment.

Even more importantly, though, it would ignore the practical realities of black lung litigation, which deviate substantially from Longshore cases.  That punitive result would also create a windfall for black lung claimants like Rice who, unlike Longshore claimants lacking access to interim benefits paid by any trust fund, received 100% of the benefits awarded to him throughout the course of these proceedings.  So even if Rice is correct that Bituminous "used the Trust Fund's assets for three-and-a-half-years" and that the Fund is "deeply in debt," he fails to offer a practical reason where "the damages sought here," which would be paid to Rice rather than the fund, "were designed to address this very situation."  *See* Opening Br. at 7, 9.

## A.   The Four Corners of Plaintiff's Complaint Demonstrate an Absence of Jurisdiction Under 33 U.S.C. § 921(d)

Plaintiff invokes this Court's jurisdiction by and through 33 U.S.C. § 921(d).  But, given that Bituminous already paid the amounts owed and made those payments within the time allowed, there is nothing more for the Court to "enforce" "compliance with." *See* 33 U.S.C. § 921(d). Because this is the only action that section 921(d) empowers this Court to take, it lacks jurisdiction.

Section 921(d) of 33 U.S.C. affords the Court jurisdiction to "enforce" "a compensation order making an award, that has become final."  Put another way, where an employer fails to pay a compensation order due under a final award, the claimant or DOL may use section 921(d) to seek the employer's compliance.  The black lung rules include a regulation that defines when a benefit payment following an adjudicated award becomes "due" and payable. It is "the thirtieth day following issuance of the district director's computation." *See* 20 C.F.R. § 725.502(b).

Here, the District Director issued an initial computation of benefits in September 2017. But he did so after Bituminous had already appealed ALJ Solomon's decision.  As such, the calculation was stale before it was even served; nothing about it was final.  There is also no dispute that Bituminous satisfied section 725.502(b)(2) by paying Plaintiff and DOL the benefits owed on February 4, 2021, after the District Director issue a final calculation. *See* Dec. of Knectel at ¶ 18.

What remains are two disputes—one concerning medical costs and another concerning interest, that the agency has refused to engage in meaningfully.  There is nothing for this Court to "enforce" under section 921(d), and thus no justiciable controversy and no jurisdiction.  This is dipositive.  *See Shumaker v. Ypsilanti Police Dept*., 98 F.3d 1342 (6th Cir. 1996) (unpublished) ("The district court may dismiss a case for lack of jurisdiction if there is not a case or controversy between the parties.") (*citing Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) and Fed. R. Cvi. P. 12(b)(1)); *Appalachian Reg. Healthcare Inc., v. U.S. Nursing Corp*., No. 14-122-ART, 2014 WL 6473628, at * (E.D. Ky. Nov. 18, 2014) (dismissing suit for want of subject matter jurisdiction and noting "[o]ne might be forgiven for wondering what [the parties] are fighting about, or whether federal court is the correct field of battle.  Article III of the Constitution…requires federal courts to ask these questions.  Occasionally, doing so reveals that the parties are fighting about nothing at all…").

The remainder of this Motion explains why importing provisions and practices unique to the Longshore Act defies congressional intent and practical considerations.  The Motion dispels Plaintiff's reliance on *Vialpando, Bryge, Templeton*, and *Thacker* which all ignore the important distinctions between Longshore and black lung litigation.  This Court should not accept Plaintiff's invitation to carve out a new cause of action that hybridizes Longshore and black lung rules where the agency, empowered by congress and with a unique understanding of the schemes' differences, expressly avoided doing so.

## B.    Plaintiff's Suit is Barred by 33 U.S.C. § 918's Statute of Limitations

Plaintiff's suit is founded upon interest and penalties supposedly resulting from a September 8, 2017 pay order.  *See* Compl. at §§ 31-34; Opening Br. at 4 ("There is no genuine dispute that from October 2017 to February 2021, Defendant did not pay Mr. Rice Benefits….even though a U.S. Department of Labor administrative law judge awarded him benefits in August 2017).  His cited cause of action, though, arises under 33 U.S.C. § 918(a), which "governs enforcement after a default on an effective award." *See Kinder v. Coleman Yates Coal Co*., 974 F.

12

Supp. 868, 871 (W.D. Va. 1997). That cause of action has a one-year statute of limitations. *Id.* at 872. Rice's suit, filed on October 6, 2021, is nearly three years too late. The Court's inquiry must end there. *See Kinder*, 974 F. Supp. at 872 (action to enforce "twenty percent penalty due to [employer's] failure to make timely payment of the retroactive benefits" brought three years after District Director's calculation "is barred by the one year statute of limitations contained in section 918(a)"); *Henry v. Gentry*, 704 F.2d 863, 864 n.1 (5th Cir. 1983) ("By explicit statutory provisions [section 918 and 921] are the sole means of enforcing compensation awards").

This timing problem presents the first of several practical conundrums infecting Plaintiff's approach. Were he correct that a non-final computation from the District Director, issued after an appeal had already been made to the Benefits Review Board, triggered a section 914(f) penalty, the parties (and judiciary) might be forced to litigate parallel proceedings every time an employer appeals an award for black lung benefits. The claimant might win on the "penalty" action only to lose on the case's ultimate merits years later, creating confusion and expense. Such an outcome is an anathema to notions of judicial economy. *See Int'l Forest Prods. Corp. v. West,* 2011 WL 4056036, at *8 (M.D. Tenn. Aug. 8, 2011) ("Moreover, judicial economy is not the only value that is placed in jeopardy by parallel proceedings, but also the legitimacy of the court system in the eyes of the public") (quoting *Romine v. Compuserv Corp.*, 160 F.3d 337 (6th Cir. 1998)).

Were Plaintiff correct that section 921's statute of limitations (adopting Kentucky's five-year general statute of limitations) applies, that would not present a workable scheme, either. Even there, the cause of action against an allegedly tardy employer might depend upon the pace of appellate proceedings in the underlying merits case. This would encourage delay (multiple briefing extension requests, *en banc* and reconsideration petitions, and certiorari petitions) and would put undue pressure on appellate tribunals to resolve cases within a particular timeframe. Rather than supporting judicial economy, this would promote gamesmanship. Especially in the case of protracted black lung litigation, where parties may wait a decade or more before an award is ultimately affirmed, the problems are profound. Here, too, Bituminous' view that payments are

due only upon the case's ultimate termination presents the only workable, common-sense approach.  Indeed, it is the one parties have followed for decades without objection by the Department of Labor or , with rare exceptions, anyone else.  *See* Dec. of Knechtel at ¶ 19.

**C.**     **Precedent Holds that Longshore Procedures Do Not Supersede Those in Black Lung; The Plain Language of the Black Lung Benefits Act Preclude Plaintiff's Suit**

Plaintiff's attempt to claim section 914(f) penalties from Bituminous assumes that Longshore payment practices and procedures apply with equal force in black lung claims.  Though several district courts accepted that reading's superficial appeal, each ignored the practical distinctions between Longshore and black lung claims.

A plain language analysis of the relevant rules shows that the incorporation of Section 14(f) in the BLBA does not—and was not intended to—follow the rules that apply in this context under the Longshore Act.  In the context of the Longshore Act, Section 14(f)'s period begins when payments are due, which occurs on the date that the district director, ALJ, Benefits Review Board, or Court issues its merits decision.  As a statutory matter, one condition—that the "payment is due"—controls the applicability of the penalty and begins the ten-day penalty period.  There is no Longshore regulation that defines specifically when a payment is due, although the penalty provision of Section 14(f) is incorporated into the Longshore regulations at 20 C.F.R. § 702.350.  Thus, the courts are free to interpret the rule to establish the meaning of the word "due" as the date a decision is reached by an adjudicator.

By design, and surely contemplating the practical differences between Longshore and black lung litigation, the Secretary of Labor has made sure that Courts are afforded no such discretion in the black lung context.  Instead, and as is relevant here, the black lung rules include a regulation that defines when a benefit payment following an adjudicated award becomes "due" and payable.  20 C.F.R. § 725.502(b). The courts of appeals recognize these distinctions, holding that where a black lung regulation deviates from Longshore practices, the black lung regulation must be followed and the contrary Longshore approach must be rejected.  *See Mullins Coal Co. v.*

*Dir., OWCP*, 484 U.S. 135 (1986); *Blankenship*, 773 F.2d at 177; *Y&O Coal v. Warren*, 841 F.2d 134, 138-39 (6th Cir. 1986); *Bethlehem Mines v. Dir., OWCP*, 766 F.2d 128, 131 (3d Cir. 1985).

A plain language analysis shows that benefits are not due for purposes of Section 14(f) at the precise moment that an ALJ or the Board or a Court issues an opinion or decision. Instead, payments are only due thirty days after the district director issues his final computation supported by an explanation of what is owed. No other interpretation of section 725.502(b)(1) makes any practical sense either.

The contrary interpretation advocated by Plaintiff makes 20 C.F.R. § 725.502(b)(1) and (2) irrelevant surplusage. *Compare* Compl. at ¶ 33 ("The Defendant did not pay Mr. Rice his benefits within 10 days of being due"); *with* 20 C.F.R. § 725.502(b)(2) ("Benefits and interest payable for such periods shall be due on the thirtieth day following issuance of the district director's computation…"). This Court is not free to create surplusage; doing so is contrary to more than a century of Supreme Court jurisprudence. *See Penn. Public Welfare Dept. v. Davenport*, 495 U.S. 522, 562 (1990) (collecting cases). It should not accept Plaintiff's invitation to reimagine this complex but workable scheme designed for black lung claims, and should instead grant this dispositive motion.

**D.    Practical Distinctions Between Longshore and Black Lung Benefits Claims, Overlooked by District Courts, Support Bituminous' Reading of the Law**

Plaintiff's counsel has convinced some courts over the years to reimagine black lung litigation as identical to Longshore litigation. Unsurprisingly, *Vialpando, Byrge, Templeton,* and *Thacker*, which treated the two as one, relied principally on an unpublished *Longshore* decision—*Navalo v. Conchise Consultancy, Inc*., 666 Fed. Appx. 661 (9th Cir. 2016) (unpub.).

These decisions each ignored practical considerations counseling against hybridizing the two schemes. Unlike *Navalo*, where a claimant was taken from the workforce immediately and prematurely after "he was shot in the back and hit by a roadside IED while working as a rear

gunner in Iraq," "will likely never reach his pre-injury earning potential,"[7] and was left without the safety net of interim benefits (no less medical coverage), *Vialpando, Byrge, Templeton*, and *Thacker* featured protracted litigation brought by claimants who had each long since retired, and, importantly, had each received interim benefits (including related medical coverage) for the duration of the proceedings. None of the practical considerations underpinning Section 914(f) apply to Black Lung litigation; borrowing it where the secretary did not makes no practical sense.

First, a "quick inexpensive" resolution—"a theme central to the spirit, intent, and purpose" of the Longshore Act,[8]—would have been impossible in these black lung cases. Mr. Rice first filed for benefits in September 1983, which ALJ Earl Thomas denied, after a hearing, on October 11, 1989.  He filed at least five subsequent claims (also unsuccessfully), and even lost his most recent one in September 2008, only to "modify" it successfully in 2013 to obtain benefits retroactive to 2006.  Similar examples of protracted black lung litigation are legion, including in *Templeton* (remanding for additional proceedings in 2017, twenty-one years after Templeton first filed for benefits) and *Thacker* (claimant retired in 1985, his first claim was denied in 1989, and he finally prevailed in 2017). *Templeton,* BRB No. 16-0188 BLA, Decision & Order of Feb. 13, 2017, slip op. at 3-4; *Clevenger v. Mary Helen Coal Co. ["Thacker"]*, BRB No. 1-0884 BLA, Decision & Order En Banc, slip op. at 2.

Nor could Bituminous (or the companies held responsible for claims in *Vialpando, Bryge, Templeton,* and *Thacker*) have acted in any way to avoid these protracted proceedings, no less the agency's involvement in them.  Instead, formal administrative proceedings in this case began on September 13, 1983 when Rice notified the agency, not Bituminous, of his claim. 20 C.F.R. § 725.303(a)(1).  Within two months, the agency notified Rice of his rights, and the claimant availed himself of an agency-sponsored examination with Dr. William Swann on November 17, 1983.  *See* 20 C.F.R. § 725.406(a) ("the Act requires the Department to provide each miner who applies for

---

7 666 Fed. App'x at 665 (Kleinfeld, S.J., dissenting).
8 *Tidelands Marine Servs. v. Patterson*, 719 F.2d 126, 129 (5th Cir. 1983).

benefits with the opportunity to undergo a complete pulmonary evaluation at no expense to the miner"). No potentially responsible employer was notified for another six months, until May 25, 1984, when a company called Golden Glow Coal Co. was notified by the agency but was subsequently dismissed from the proceedings in favor of KRCC on August 13, 1984. Put another way, by the time KRCC had even learned of Mr. Rice's claim, the agency (1) processed Mr. Rice's claim paperwork; (2) arranged and paid for a medical exam and (3) investigated and dismissed a prior operator. Even if settlement were permissible, the agency acted before Bituminous could have even offered one. Of course, settlement is forbidden in the black lung setting, *Ramey,* 326 F.3d 474, as is any hope of avoiding fee-shifting. *See* 20 C.F.R. § 725.366 (fees for representatives). So while "[t]he LHWCA demonstrates a legislative intention to encourage employers to pay compensation under the Act without resort to formal adversarial proceedings,"[9] such aspirations are a nullity in this and almost all black lung cases. Here, too, incorporating a Longshore provision designed to accomplish goals made impossible by black lung regulation and practice makes no sense.

Next, this is not a case where a 20% penalty would serve to compensate Rice "where his wage-earning capacity has been reduced." *See* 1981 Leg. Hist. at 35-36. Such was the case in *Navalo*, where the claimant's severe and immediate gunshot injuries meant he "will likely never reach his pre-injury earning potential." And Navalo's claim was not at all the subject of endless filings, denials, modifications stretching over decades. The merits of his claim were hardly contested at all. But from the time Rice retired in 1983 until 2013, at least three separate ALJs and multiple district director's representatives agreed he was fit to work. *See Rice*, 969 F.3d at 321. Pneumoconiosis's effects did not apparently disable him until more than twenty years after his retirement. So, too, for the claimants in Rice's cited authority. *Compare Vialpando,* No. 2012-BLA-05572, Decision & Order of June 7, 2016, slip op. at 2 (noting claimant, who filed for benefits in 2011, retired in 2001 "when his wife became sick," not necessarily because of a total disability);

---

[9] *Pleasant-El v. Oil Recovery Co.* 148 F.3d 1300, 1303 (11th Cir. 1998).

*Byrge,* No. 2011-BLA-05897, Decision & Order of Jan. 16, 2013, slip op. at 1-3 (filing a second claim for disability benefits in 2010, having retired on May 23, 1986 and having had his initial claim denied in 2007); *Templeton,* BRB No. 16-0188 BLA, Decision & Order of Feb. 13, 2017, slip op. at 3-4 (noting two denied claims in 1996 and 2003 for want of any element of entitlement after Templeton's retirement); *Clevenger v. Mary Helen Coal Co.*, No. 1-0884, slip op. at 2 (wherein the Board, in 2001, noted the case's "lengthy procedural history" including where Mr. Clevenger was adjudicated fit for work on March 9, 1989, several years after he retired).

Sixth, from the moment an adjudicator agreed that Rice was entitled to benefits—over thirty years after his first claim was denied—he has received them monthly. Unlike Mr. Navalo, eluded by any "quick redress" during his claim's litigation, Rice received interim benefits immediately and on an ongoing basis. *See* Compl. ¶ 21. And unlike in Navalo's case, where an "employer's failure to timely comply with" an order requiring a one-time payment hindered the claimant's ability to "allocate money for future medical expenses," Mr. Rice's medical benefits relating to pneumoconiosis were provided and benefits are perpetual. The Longshore Act's legislative intent to compensate a claimant sidelined from work who "has gone into debt while waiting for an award" with a 20% penalty is inapposite. *See* 1981 Leg. Hist. at 35-36.

In sum, even if the superficial appeal of Plaintiff's mixing-and-matching Longshore and black lung provisions could be read to support his view, these practical considerations do not.

## D.   Amounts Owed Cannot be "Due" Until Calculated With Specificity and Transparency

This case, more than others, crystalizes the impractical consequences of requiring an employer to pay benefits before there is certainty about what is actually due.

The payment scheme for black lung benefits requires a set of calculations based on the dates of a claimant's employment, the applicable interest rates during that time period, the number of dependents and augmentees he or she has during a given year, potential offsets, and the cost of medical and indemnity benefits to be reimbursed to the Trust Fund. This is not a "purely

ministerial"[10] calculation that can be done by an employer simply because an ALJ has decided that a claimant is entitled to benefits.  And it constantly changes.

ALJ Solomon's September 2017 opinion and subsequent proceedings illustrate these points.  His opinion does not direct the payment of benefits and it does not identify how much should be paid. Nor did this ALJ even know how much reimbursement was owed to the black lung trust fund. Nor could the carrier hare know how much was owed because only DOL properly has the information to make the calculation.   And, it noted, explicitly, that the award was subject to appeal.  Indeed, Bituminous appealed it to the Benefits Review Board, which did not affirm the ALJ's decision for nearly a year.  And, like the ALJ's September 2017 opinion, the Board's affirmance made no mention of the amounts due or the timing for those payments or Trust Fund reimbursement. Nor did the Sixth Circuit's.  Nor did any tribunal revisit the District Director's September 2017 award or explain how the figures had changed in the nearly five years since its issuance. Those amounts were only first enumerated in the District Director's September 2017 computation letter.  But by the time the letter issued, it was already stale: Bituminous had already appealed the case to the Board.  The next computation did not come until January 2021 after the Sixth Circuit affirmed the award. And even then, questions persisted.

The case at bar crystalizes the two schemes' differences.   If Plaintiff's foundational assumption is correct, and the law that applies in Longshore cases applies to ALJ decisions in

---

[10] In this regard, *Byrge*'s reliance on *Navalo*, a Longshore case, to describe the complex award calculation involved in black lung adjudications as a "ministerial" one, was erroneous.  *See Byrge*, 301 F. Supp. at 797.  The differences inherent in those two schemes, which have been recognized by Congress and the Secretary of Labor alike, demonstrate why a "compensation order" in the black lung context necessarily comes from the district director, necessarily includes a precise indication of the monies due, and must explain the method of calculation. The *Byrge* Court's failure to recognize these distinctions demonstrates a lack of familiarity with the two compensation schemes which led to an erroneous decision that ignored controlling circuit court authority affirming the differences between the two.  *See Stapleton v. Westmoreland Coal Co.*, 785 F.2d at 437, *Warren*, 841 F.2d at 138-39.  Such error should not be repeated.

black lung claims, then the parties *still* do not have an enforceable order because the agency continues to refuse to provide a method explaining the amounts it claims are due. *Id.*; *see also Stetzer v. Logistec of Connecticut, Inc.*, 547 F.3d 459, 464 (2d Cir. 2008) (adopting the Fifth Circuit's test for determining the finality and enforceability of an ALJ's order under 33 U.S.C. § 914(f) and holding that an ALJ's order is not final and enforceable if it does not "specify the amount of compensation due or provide a means of calculating the correct amount without resort to extra-record facts which are potentially subject to genuine dispute between the parties.").

The Fifth Circuit's decision in *Lazarus v. Chevron* crystalizes the problem. There, a Longshore claimant sought to enforce a penalty against an employer even though the agency did not describe the amounts supposedly due. The Fifth Circuit rejected that effort:

> To constitute a final decision and order of the ALJ, the order must at a minimum specify the amount of compensation due or provide a means of calculating the correct amount without resort to extra-record facts which are potentially subject to dispute between the parties.

958 F.2d 1292, 1303 (5th Cir. 1992) (*quoting Severin v. Exxon Corp.*, 910 F.2d 286, 289 (5th Cir. 1990)). The Court added that the ALJ's order "falls afoul of the rule set forth in *Severin*" because

> he never specified the amount of compensation due, nor did he provide a means of calculating this amount. He did not say what expenses were related to the injury…we do not know for sure whether the ALJ even reviewed Lazarus's medical bills. The ALJ must not delegate the task of calculating the amount of the award to the deputy commissioner unless it provides some method of doing so.

*Id.* Concerning disputed medical bills, the Court likewise faulted the agency for "simply asserting" that certain amounts were "in fact due" and defaulted upon "without explanation." *Id.*

So too here. Even now, months after Rice filed suit to enforce a penalty based upon a "final" award, the agency has refused to provide the method it used to calculate the benefits it alleges are owed, asserting, as the agency did in *Lazarus*, that the amounts are simply "in fact due." *Id.; see* Dec. of Knechtel at ¶¶ 22-24. In fact, the agency's purported amounts ($65,443.78) were materially higher than figures calculated by counsel. *See* Dec. of Knechtel at ¶¶ 22; *Cf.* Compl. at ¶ 42 (noting interest "not to exceed" the agency's stated amount); Opening Br. at Ex. 8 (draft order

granting interest "to be determined" after the parties "confer"). This arbitrary, opaque figure neither complies with the APA nor with *Lazarus*. *See also Morehead Marine Serv., Inc. v. Washnock*, 135 F.3d 366, 375 (6th Cir. 1998) (the APA imposes upon an agency the duty of explanation). The lingering uncertainty reveals the wisdom in the Fifth Circuit's approach: unless and until a definitive calculation, supported by a reliable method and good faith explanation, is set out, uncertainty remains and a final payment is impossible. Here, extra-judicial facts "subject to genuine dispute between the parties" (untangling the agency's clandestine approach to the interest calculation, lingering disputes about medical costs unrelated Rice's pneumoconiosis), means the parties "do not know for sure" what is owed. And unlike in Longshore cases, the parties have no ability to independently agree to an uncertain "settled" amount; the BLBA prohibits that course.

Plaintiff's Complaint cannot be reconciled with the procedure that Congress established for black lung claims, and it cannot be reconciled with his jurisdictional invocation of section 921(d), which governs the enforcement of *final* awards.[11]  *See* 33 U.S.C. § 921(a) (an order becomes final thirty days after its issuance or, if appealed, after a decision on appeal is issued and no further appeal is filed); *see also Snowden v. Dir., Office of Workers' Comp. Programs*, 253 F.3d 725, 729-30 (D.C. Cir. 2001); *Providence Washington Ins. Co. v. Dir., Office of Workers' Comp. Programs*, 765 F.2d 1381, 1385 (9th Cir. 1985); *Lazarus*, 958 F.2d at 1304 (no "final" order where the court is "left with the possibility that neither the ALJ nor the deputy commissioner actually calculated the amount of money Chevron owed"). Because it casts aside the plain language of the BLBA, the precedent recognizing the material distinctions between Longshore and

---

[11] Plaintiff's request for interest on the twenty percent penalty also is an improper request in the absence of any determination that such a penalty was due. The January 15, 2021 final computation letter did not order Bituminous to pay any additional compensation, it said that the failure to initiate benefits "may be subject to a penalty up to 20% of the amount due." Were that "additional compensation" actually due, the letter would have said so. Moreover, where interest is statutory, as it is under the black lung program, a specific statutory authorization is required and there is none with respect to any amount owed under section 914(f). Plaintiff's apparent request for pre-judgment interest is also barred under the BLBA. *See Warren*, 841 F.2d 134.

black lung adjudications, and the practical considerations informing that authority, Plaintiff's Complaint must fail.

## D.     Rice's Approach Chills Appellate Rights

Finally, Rice's proposed approach would discourage employers from availing themselves of their appellate rights.

The Sixth Circuit has held that described it a "manifest injustice" when a "claimant would receive benefits to which he is not entitled…and an employer would be required to pay for any such benefits." *See Consolation Coal Co. v. McMahon*, 77 F.3d 898, 905 (6th Cir. 1996). Appellate proceedings ensure these equities.  For his part and over the course of twenty-five years, Rice filed multiple claims, multiple requests for modification, and multiple appeals to the Board without incurring any penalties. That was his right. *See id.*; *see also Consolidated Coal Co. v. Worrell*, 27 F.3d 227 320 (6th Cir. 1994) ("once a request for modification is filed, no matter the grounds stated, if any, the deputy commission has the authority, if not, the duty to reconsider all the evidence for any mistake of fact or change in condition."). It is not fair that the moment an adjudicator finally agreed with Rice's view of the evidence decades into these proceedings, Bituminous thereafter faced penalties discouraging it from pursuing that same course.  *King v. Jericol Min., Inc.*, 246 F.3d at 825 (holding that the same rules for challenging a decision must apply to claimants and employers alike); *Old Ben v. Dir., OWCP [Hilliard]*, 292 F.3d 533 (7th Cir. 2002) (same). Especially where claimants are not required to repay interim benefits when seeking modification, this paradigm runs afoul of the APA.  *See* 5 U.S.C. § 559 (privileges and procedures must apply evenly to all parties before an agency).

As congress recognized, "[t]here is, of course, a real likelihood, almost a certainty" that "the employer may be unable to recoup [ ]benefits if the award is eventually overturned").  *See* 1981 Leg. His. at 35-36. Rice's interpretation of the 20% penalty poses an impossible Catch-22: either bear that risk or be penalized.  But requiring appellate litigants to "bet the farm" to avoid the "manifest injustice" of improperly decided awards does not offer "meaningful relief." *Thunder*

*Basin v. Reich*, 510 U. S. 200, 212 (1994).  For its part, the agency will not support an employer's effort to recover erroneous overpayments made over the course of years of litigation.  The *Byrge* Court's assertion that "if the Defendants prevail in their continued litigation, they will not owe the Plaintiff—hence, no punishment," 301 F.3d at 799, ignores these practical realities.

Though Plaintiff points to "the problem for the federal fisc with making the Trust Fund the surrogate payor for interim benefits," Opening Br. at 7-8, the agency's financial problems represent self-inflicted wounds.  This case makes the point.  When Rice disagreed with the agency's 2016 finding that he was not entitled to benefits, Bituminous, alone, developed evidence supporting the agency's denial, arguing for the same through a closing brief presented to ALJ Solomons.  The agency mounted no similar defense, dispensing with briefing the medical merits of Rice's case altogether. In this respect, the agency pushed responsibility to defend the District Director's assessment to Bituminous.  Though Rice characterizes the paradigm as one where coal operators "improperly us[e] public assets to pay their own liabilities," Opening Br. at 7, in fact, the opposite is true:  the agency required a private actor to defend its own adjudicator's findings. Nor would these wounds find amelioration in a 20% penalty award to Rice.  *But see id.* at 9 (arguing "the damages sought" are designed to remediate the Fund's losses).

Even worse, proceedings were delayed by nearly five years because the District Director had improper *ex parte* communications with Rice's former counsel in violation of the APA and procedural due process.  5 U.S.C. § 551(14) (the APA prohibits *ex parte* contacts in adjudications, which "means an oral or written communication not on the public record with respect to which reasonable prior notice to all parties is not given); 5 U.S.C. § 557(d)(1)(C) (prohibited *ex parte* communications render agency adjudications voidable; the agency shall make a record of all *ex parte* communications or provide a memorandum stating the substance of them); *see also Island Creek Coal Co. v. Holdman*, 202 F.3d 873, 883-84 (6th Cir. 2000) (where agency's negligence or malfeasance result in delay or threaten prejudice, due process demands the agency pay any benefits owed); *Consolidation Coal Co. v. Borda*, 171 F.3d 175 (4th Cir. 1999)(coal mine operator denied

due process by government's delay). Especially here, where protracted litigation is the agency's fault—not the employer's—the equities call out for the agency, not Bituminous, to bear the risk that paid benefits will not be recouped from a claimant upon an appeal's success. See *Nowlin v. Eastern Associated Coal Corp.*, 331 F. Supp. 2d 465, 475 (N.D. W. Va. 2004) (noting the Director's argument that employers should bear the cost of "protracted litigation" they cause).

## CONCLUSION

Admittedly, the Court's task here is a complicated one. As it navigates the "legislative morass" Plaintiff's suit presents, the Court must remain mindful of the practical considerations underpinning Plaintiff's request and must endeavor to find a "rational and sensible construction of the language in question." If this were a Longshore claim, there would be rational, sensible, policy-based reasons supporting Plaintiff's demand. Here, there are not. Appreciating as much will avoid errors other courts have made. For the foregoing reasons, the Court should deny Plaintiff's Motion for Summary Judgment and grant Defendant's Cross-Motion.

<div style="margin-left:50%">

Respectfully submitted,
/s/ Matthew J. Zanetti
Matthew J. Zanetti
Ferreri Partners, PLLC
2410 Frankfort Avenue
Louisville, KY 40206
(502) 459-2685
mzanetti@ferrerilaw.com

Mark E. Solomons (pro hac vice)
Greenberg Traurig, LLP
2101 L Street, N.W., Suite 1000
Washington, D.C. 20037
(202) 533-2362
solomonsm@gtlaw.com

*Attorneys for Defendant*

</div>

**CERTIFICATE OF SERVICE**

I hereby confirm that the foregoing Cross-Motion for Summary Judgment was served on all parties of record via the Court's CM/ECF System this 21st day of June, 2022.

/s/ Matthew J. Zanetti